UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                    Case No. 20-CR-234

JOHN YANG,

        Defendant.

---

**ORDER DENYING MOTION TO SUPPRESS**

---

John Yang is charged in an indictment with possession with intent to distribute 5 grams or more of actual methamphetamine, in violation of 21 U.S.C. § 841, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). The charges arise out of a police encounter with Yang and other occupants of the vehicle in which he was riding in the early morning hours of November 23, 2020. The case is before the Court on Yang's motion to suppress the evidence obtained during the encounter. Yang contends that police violated his Fourth Amendment rights by stopping the vehicle without probable cause or even a reasonable suspicion that either he or the driver had committed a crime. The Court held a hearing on Yang's motion on February 10, 2021, and the motion became fully briefed on April 5, 2021. What follows are the Court's findings of fact, conclusions of law, and decision.

I.

On November 23, 2020, at approximately 1:30 a.m., Green Bay Police Officer Benjamin Harvath was on routine patrol in the Bravo District of the City of Green Bay when he observed a dark colored Dodge Ram pick-up truck parked on the north side of Kellogg Street near the

intersection with Ashland Avenue facing westbound. Officer Harvath was traveling eastbound on Kellogg. As he drove by the pick-up truck, Officer Harvath noticed that there were two people in the vehicle. The engine was running but no lights were on. After he passed the vehicle, Officer Harvath made a U-turn and again drove past the pick-up truck to obtain its license number. As he traveled westbound past the vehicle on Kellogg, Officer Harvath noticed a person walking eastbound on Kellogg toward the vehicle about two or three houses away.

Officer Harvath immediately suspected that the people he observed were involved in purchasing drugs. He had been a Green Bay police officer since October 2016 and had received training in drug interdiction. Five days earlier, he had received an email from Officer Krueger, who had previously worked an overlapping shift, advising him that he had received multiple complaints about suspected drug activity at 826 Kellogg Street. Neighbors had complained of traffic in and out of that location at suspicious times of the day. The person he observed in the early morning hours of November 23 appeared to be coming from the location of that house.

Officer Harvath also thought it significant that the person he observed was walking toward the pick-up truck he saw parked on a residential street at 1:30 on a cold morning with two occupants and the motor running about a block away from the suspected drug house. Harvath knew from experience and training that customers of drug dealers frequently park down the block from a drug dealer's house in order to avoid creating the type of suspicion by neighbors that provided the basis of Officer Krueger's email. Given the cold temperature and the time of day, he could think of no other reason why the driver of the pick-up would park and make his passenger walk to his location, as opposed to driving up to the house from which he had emerged. Officer Harvath also noted that this was a residential neighborhood and that at 1:30 a.m. there were no

other vehicles or pedestrians moving about. Even aside from Officer Krueger's email, Officer Harvath knew from his own experience that this area of Bravo District had significant drug activity.

As Officer Harvath continued past the pick-up truck, he communicated his suspicions via radio to other officers in the area. As he was doing so, the pick-up turned on its lights and proceeded to turn south onto N. Oakland Avenue. Officer Harvath performed another U-turn and attempted to follow it. Officer Harvath testified that as the pick-up truck approached the stop sign at the intersection of N. Oakland Avenue and Dousman Street, he was turning onto N. Oakland Avenue. As he watched it approach the intersection, he observed the truck's brake lights come on and the pick-up conduct a "rolling stop" before suddenly signaling and turning left onto Dousman. At that point, Officer Harvath sped up and followed the truck as it turned from Dousman onto Ashland. He activated his emergency lights as the vehicle pulled into the parking lot for the Blackstone Family Restaurant where the occupants intended to eat.

Officer Garth Russell, who was also patrolling Bravo District, had seen the same Dodge Ram pick-up truck earlier at the Express Convenience Center near one of the gas pumps as he was passing by shortly after 1:00 a.m. He saw three males standing outside the vehicle, one of whom was holding a chain saw. This observation and the fact that one of the individuals, the defendant, was staring at him during the entire time he was driving by made Officer Russell suspicious. When he heard Officer Harvath's radio transmission about his own observations of the same truck, Officer Russell proceeded to follow the vehicle as well and arrived at the Blackstone Restaurant just as Officer Harvath was approaching the driver's side of the truck.

The dashboard cameras of the two officers' squad cars and their respective body microphones reveal what then occurred. Within 30 seconds of stopping his squad car, Officer Harvath was at the driver's door speaking with the driver who identified himself as Adam Zimdars.

3

Within another minute, Officer Russell was at the passenger window speaking with the middle-seat passenger, Justin Taylor, and the window-seat passenger, John Yang, who appeared to be the person Officer Harvath had seen earlier walking toward the truck. In response to Officer Harvath's questions about what they were doing, Zimdars confirmed they had picked Yang up near Kellogg and Ashland and drove to the restaurant. Zimdars further confirmed they had been at the Express gas station and, before that, the casino. When Officer Harvath asked Zimdars why they were out so late, he replied that he had trouble sleeping from his time in the military. Zimdars told Officer Harvath that the truck belonged to his uncle, but the registered owner turned out to belong to someone else. When asked if there were any weapons or anything illegal in the car, Zimdars replied "I don't have anything illegal" and "not that I'm aware of."

    These equivocal responses increased Officer Harvath's level of suspicion. Based on his experience, he noted that most people with nothing to hide answer more directly. Officer Russell meanwhile had approached the passenger side, where Yang was seated, and asked for identification. Yang and Taylor were not carrying identification, and Yang challenged why they should provide it. Officer Harvath then explained to Zimdar that they were stopped for rolling through the stop sign at Oakland Avenue. Harvath also said a license plate light was out, though he did not intend to make an issue of it. Officer Russell also noted that neither passenger was wearing his seat belt. Officer Russell then wrote down the occupants' names and dates of birth and handed them to Officer Harvath, who proceeded to his squad car to check for warrants. As he proceeded to his squad, Officer Harvath conveyed to Officer Russell that he had called for the canine unit to conduct an exterior sniff of the vehicle for drugs.

    Officer Russell continued to converse with the truck occupants at the passenger window. He told them he had seen them earlier at the Express store. Yang seemed to deny having been

4

there, and Zimdar gave confusing information about when and who had been dropped off in the residential area where Officer Harvath had first spotted the truck. Yang also seemed unusually nervous and kept moving his hands to his waistband where Officer Russell could not see them, notwithstanding Officer Russell's repeated directions to keep them where they were visible.

By this time, approximately six minutes after the stop, Officer Reetz had arrived at the scene with his drug detection dog. It was department policy to have the occupants of a vehicle exit it before a drug detection dog conducted an exterior sniff. When Officer Russell instructed the occupants to exit the vehicle and opened the passenger door, he noticed that Yang became pale and slumped down in his seat. As Yang exited the truck, Officer Russell again told him to keep his hands visible, but Yang did not comply and reached for his waist. Russell tried to grab Yang's hands, but he pulled away. Russell turned Yang around and tried to stabilize him against the car, and a struggle ensued. Officer Harvath ran from his squad car to assist Officer Russell, and in seconds, Yang and the two officers were wrestling on the ground. During the course of the struggle, a gun and packaged marijuana and methamphetamine fell to the ground from Yang's person. Yang was then placed under arrest while Officer Reetz maintained watch of Zimdars and Taylor. The drug detection dog remained in Reetz' squad car throughout the incident and never did approach the truck.

## II.

"The Fourth Amendment, which protects 'against unreasonable searches and seizures,' does not shield citizens from heads-up police work." *United States v. Morrison*, 254 F.3d 679, 681 (7th Cir. 2001). The question presented in his motion to suppress is whether what Yang and his friends encountered here was simply "heads-up police work." A law enforcement officer may stop a vehicle when there is probable cause or at least a reasonable suspicion to believe the driver

has committed a traffic violation or is otherwise involved in criminal conduct. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020); *see also Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) ("Under this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) and citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968))). "Although a mere 'hunch' does not create reasonable suspicion, . . . the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted).

Pulling over a motor vehicle, whether for a routine traffic violation or on suspicion of involvement in criminal conduct, is a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). To prevent abuse, the investigation following such a stop "must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *Id.*; *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns."). Where the stop is simply for a routine traffic violation, the accepted inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof

6

of insurance." *Rodriguez*, 575 U.S. at 355. Where the stop is based on reasonable suspicion of involvement in more serious criminal activity, additional questions might be warranted. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."); *see also* 3 W. LAFAVE, SEARCH AND SEIZURE § 9.2, at 36–37 (1978) ("It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained."). Finally, "[d]uring a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 n.6 (1977)).

In this case, Officer Harvath offered two justifications for his decision to stop the pick-up truck in which Yang was riding. The reason he offered to the occupants of the vehicle at the time of the stop was that Zimdars had not come to a full stop at the stop sign at the corner of N. Oakland Avenue and Dousman Street. In addition, however, and in fact the real reason Officer Harvath decided to stop the pick-up truck was that he suspected the occupants were involved in a drug transaction. Yang challenges both justifications and contends that Officers Harvath and Russell acted on no more than a hunch.

Yang challenges Harvath's testimony that Zimdars had failed to come to a complete stop at the intersection of N. Oakland and Dousman, noting that one cannot discern from the video taken from the dashboard camera of Officer Harvath's squad car whether the truck came to a

7

complete stop or not. The video from Officer Harvath's squad car, which was following at least a city block behind the truck, shows the truck's brake lights come on as the truck slowed down at the stop sign and then proceed to take a left turn onto Dousman after another vehicle traveling on Dousman clears the intersection. Yang also notes that Officer Harvath also stated to the occupants that the license plate lamp on the truck was out, but the video at the stop shows that at least the lamp on the driver's side was lit after the truck stopped at the restaurant. As to Officer Harvath's suspicion that the occupants of the truck were involved in a drug transaction, Yang argues that Officer Harvath's observations of entirely innocent conduct, even when considered together, do not support a reasonable suspicion.

The Court finds the testimony of both police officers credible and that the stop was lawful. Yang is correct that one cannot discern from the video taken by the dashboard camera of Officer Harvath's squad car whether the truck came to a complete stop. But that does not mean the vehicle actually came to a complete stop or that the officer was mistaken. The dashboard camera's recording of the asserted violation was taken at a distance. Officer Harvath's testimony was based on his personal observation at the time as he was following the vehicle. It is not foreign to human experience for personal observation in matters involving motion, distance, and perspective to be more clear when viewed live than from a video recording. *See, e.g.*, *United States v. Cole*, ___ F.3d ___, 2021 WL 1437201, at *3 (7th Cir. Apr. 16, 2021) ("The dashboard camera's recording of the asserted violation was taken from a distance, and it is grainy, with a partially obstructed view. The magistrate judge did not clearly err in crediting Trooper Chapman's testimony that he saw what was in his judgment a violation and in treating that judgment as objectively reasonable."). Nor does the fact that the driver's side registration lamp was lit at the time of the stop undermine Officer Harvath's credibility as to the stop. As Officer Harvath testified, it was the driver's side

lamp that was lit, leaving the possibility that a second lamp on the passenger side was out. It was perhaps for this reason that Officer Harvath stated he did not intend to make an issue of it. In any event, the Court finds Officer Harvath's testimony credible and concludes he had at least a reasonable suspicion to believe a traffic violation had occurred.

The Court also finds the stop was justified under *Terry*. Officer Harvath, an experienced patrol officer with significant training and experience in drug interdiction, had more than "inarticulate hunches." *Terry*, 392 U.S. at 22. He was "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." *Id.* at 21. Officer Harvath articulated those facts in his testimony. He noted he observed a pick-up truck parked on a residential street with two occupants, its lights off, and the engine running at 1:30 in the morning. He had received information from another officer who covered the same area that there was a house less than two blocks away where drug trafficking was suspected based on the number and timing of visitors. When he turned around and went past the vehicle a second time, Officer Harvath noticed a person several houses away walking toward the truck. Although he did not personally observe the person get into the truck, he reasonably inferred that the truck was waiting for him to arrive. Other than the person walking and the people in the running truck, the streets were deserted. Because it was cold and dark, Officer Harvath thought it strange that the truck had not driven to the location from which the individual came, instead of waiting for him to walk to the truck. Based on his training and experience, he knew that people who purchase drugs in residential neighborhoods frequently park a block or two away from their source so as not to draw neighbors' attention and generate reports to police. The fact that the truck started driving away shortly after Officer Harvath passed by in the time it would have taken the individual he saw to enter the truck further supported his suspicions.

9

Yang notes that none of Officer Harvath's observations were of illegal conduct and all of them could be consistent with innocent explanations. But, of course, that is not the test. As the Court explained in *Terry*, the acts observed by the officer may be innocent in themselves. In *Terry*, a police officer suspected two men of planning a daytime robbery when he saw them repeatedly take turns walking down the sidewalk to peer into a store window on a public street at 2:30 in the afternoon. After they walked away, the officer approached the men, identified himself as a police officer, and asked them to identify themselves. The men mumbled something in response to his inquiries, and the officer grabbed one of the individuals, later identified as Terry, and patted down the outside of his clothing. He felt a pistol in the left breast pocket of Terry's overcoat and later discovered another revolver in the outer pocket of the overcoat the other man was wearing. In affirming the state court decisions denying Terry's motion to suppress, the Court made clear that the acts giving rise to a reasonable suspicion can be innocent in themselves. *Id.* at 22. Since then the Court has explicitly rejected the kind of "divide and conquer analysis" where each fact relied upon by the officer is considered in isolation and then rejected as innocent explanations are suggested. *United States v. Arvizu*, 534 U.S. 266, 275 (2002). When determining whether an officer had the reasonable suspicion required for a brief investigatory stop, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* at 273.

Applying that test here, the Court concludes that Officer Harvath had a reasonable suspicion that criminal activity "may be afoot," *id.*, when he stopped the pick-up truck and questioned its occupants after they pulled into the Blackstone parking lot in the early morning hours of November 23, 2020. Officer Russell's previous observations of the truck at the Express store, in particular, Yang's intense staring at Officer Russell as he drove past, provided additional

10

grounds for suspicion, as did Zimdars' equivocal responses to Officer Harvath's questions, the confusing and inconsistent responses to Officer Russell's questions, and the increasing nervousness of Yang and his refusal to keep his hands where Officer Russell could see them. In all, about seven minutes elapsed from the time the officers approached the truck until Yang was arrested. Officer Harvath was attempting to verify their identifications and determine whether any of the occupants had warrants when the struggle ensued between Yang and Officer Russell, resulting in the discovery of the gun and drugs. Neither officer prolonged the stop beyond the time needed to address the concerns that gave rise to it.

Based upon these findings, Yang's motion to suppress (Dkt. No. 13) is **DENIED**. The Clerk is directed to set this case on the Court's calendar for a conference with counsel to discuss further proceedings.

**SO ORDERED** at Green Bay, Wisconsin this 26th day of April, 2021.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court

11

Case 1:20-cr-00234-WCG   Filed 04/26/21   Page 11 of 11   Document 26